\*\*E-filed 5/11/2011\*\*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FAIZA MARIE PAULY,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>STANFORD HOSPITAL,<br><br>　　　　　　Defendants. | Case Number 10-CV-5582-JF (PSG)<br><br>ORDER[1] GRANTING MOTION TO DISMISS<br><br>[Re: Docket No. 5] |

　　Plaintiff Faiza Pauly ("Pauly") asserts a single claim for relief pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd(a). Defendant Stanford Hospital ("Stanford") moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief may be granted. Pauly opposes the motion. For the reasons discussed below, the motion will be granted, with leave to amend.

---

[1] This disposition is not designated for publication in the official reports.

## I. BACKGROUND

On November 7, 2008, Makenzie Pauly[2] "underwent exploratory laparoscopic surgery and an appendectomy for abdominal pain at Sutter Memorial Hospital." (Compl. 3:6-8.) After the surgery, Mackenzie began experiencing pain around the site of the incision, and the medical staff at Sutter administered pain management medications. (*Id*. at 3:9-12.) Sutter physicians did not believe that they could provide adequate care for Makenzie, and as a result they contacted Stanford "to inquire if Makenzie's case was appropriate for follow up." (*Id*. at 3:12-16.) Apparently Makenzie's case was deemed "appropriate," and she was discharged from Sutter with instructions to schedule outpatient care at Stanford. (*Id*.)

On November 14, 2008, Pauly took Makenzie to Stanford's emergency room because Makenzie was experiencing "unbearable pain." The emergency room staff conducted a medical screening, initiated pain management procedures, and attempted to determine the cause of the pain. (*Id*. at 3:19-21.) Although Makenzie obtained temporary relief, the emergency room staff was unable to diagnose the source of the pain. (*Id*. at 3:24-28.) Stanford then discharged Makenzie, providing her with new pain medications and instructing her to wait until her scheduled outpatient clinic appointment in January. (*Id*. at 3:26-28.)

On December 4, 2008, Makenzie again began experiencing "unbearable pain" and was admitted to the emergency room at Sutter. (*Id*. at 4:1-2.) One day later, she was given an injection of Bupivacaine that caused a severe reaction and unmanageable pain. (*Id*. at 4:3-6.) Sutter physicians subsequently concluded once again that they could not provide adequate treatment for Makenzie, and they informed Pauly that her daughter needed treatment from a specialized facility. (*Id*. at 4:7-9.) On December 7, 2008, Sutter physician Dr. Gates contacted Stanford and requested that Makenzie be transferred. Stanford allegedly informed Dr. Gates that "they would accept Makenzie in transfer but did not currently have a bed available." (*Id*. at 10-11.) Pauly claims that on December 10, 2008, someone at Stanford contacted the attending physician at Sutter and indicated "that the issue was not really the lack of a bed but that Stanford

---

[2]Makenzie Pauly is Pauly's minor daughter.

1  had a policy not to admit anyone to inpatient pain management until they had 'failed outpatient
2  clinic.'" (*Id*. at 4:26-5:1.) After learning of Stanford's policy, Pauly agreed to Makenzie's
3  discharge from Sutter, and she immediately took her daughter to Stanford's emergency room in
4  hopes of receiving "stabilizing treatment." (*Id*. at 5:2-13.)

5  Upon her arrival at Stanford, Makenzie received an initial examination that included
6  documentation of her vital signs, assessment of her pain level, and administration of morphine.
7  (*Id*. at 5:13-28.) However, the attending resident refused to administer further treatment or admit
8  Makenzie to inpatient treatment because of the previously communicated "outpatient failure"
9  rule. (*Id*. at 6: 1-8.) Pauly attempted to communicate her belief that Makenzie's condition was a
10 result not of "chronic pain" but of some type of post-surgical reaction. (*Id*. at 6:4-24.) Stanford's
11 physicians refused Pauly's continued requests to have her daughter admitted, and Pauly was
12 forced to remove Makenzie from the hospital in a wheel chair. (*Id*. at 6:15-7:9.) "Makenzie was
13 later diagnosed and treated for a myotoxic drug reaction to the surgical anesthesia Bupivacaine,
14 of which she received a second dose at Sutter Hospital on December 5, 2008 . . . ." (*Id*. at 7:10-
15 12.)

## II. LEGAL STANDARD

Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)). Thus, a court need not accept as true conclusory allegations, unreasonable inferences, legal characterizations, or unwarranted deductions of fact contained in the complaint. *Clegg v. Cult Awareness Network*, 18 F.3d 752,

754-755 (9th Cir. 1994). If a complaint lacks facial plausibility, leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995). When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

### III.  DISCUSSION

Stanford contends that Pauly lacks standing to bring a direct EMTALA claim related to the treatment of her minor daughter, as EMTALA's civil enforcement provision provides a private right of action only for the individual patient. (Mot. to Dismiss, 3:15-19.) Pauly argues in her opposition papers that both the language of the statute and authoritative precedent support third-party standing. (Pl.'s Reply, 2:22-4:2.) The issue of whether third parties have standing to bring claims under EMTALA appears to be one of first impression in the Ninth Circuit.

**A.     EMTALA's civil enforcement provision (42 U.S.C. § 1395dd(d)(2)(A))**

Pursuant to EMTALA's civil enforcement provision, "*[a]ny individual* who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate." 42 U.S.C. § 1395dd(d)(2)(A) (emphasis added).

**B.     The parties' contentions**

Stanford argues that a non-patient third party lacks standing to bring a claim under EMTALA. It cites two district court decisions in support of its position: *Zeigler v. Elmore County Health Care Authority, et al.*, 56 F. Supp. 2d 1324 (M.D. Ala. 1990), and *Sastre v. Hospital Doctor's Center, Inc.*, 93 F. Supp. 2d 105 (D. Puerto Rico 2000). Both opinions rely heavily upon EMTALA's legislative history. Pauly argues that both cases apply faulty methods of statutory interpretation and fail to follow other authoritative precedent. (Pl.'s Reply, 2:22-26.) She asserts that "the plain language of EMTALA is clear and unambiguous on the issue of who may bring a claim in a civil EMTALA action," (*Id*. at 4:1-2), and that it is clear that a third party may have standing to bring an EMTALA claim. Pauly relies primarily upon *Moses v. Providence Hosp. And Medical Ctr. Inc.*, 561 F.3d 573 (6th Cir. 2009). She also observes

4

Case No. 10-CV-5582-JF (PSG)
ORDER GRANTING MOTION TO DISMISS
(JFEX2)

correctly that where the language of a statute is unambiguous, the significance of legislative history is significantly diminished.

**C.     Analysis**

In *Zeigler*, as is the case here, the plaintiff was a mother who sued for EMTALA violations related to the treatment of her infant daughter.[3] The defendant hospital argued successfully that it was entitled to judgment as a matter of law because the plaintiff lacked standing. *Id*., 56 F. Supp. 2d at 1326. The court carefully detailed the legislative history of EMTALA's civil enforcement provision, which is embodied in H.R. 3128. In its original form, the provision would have permitted *"[a]ny person or entity that is adversely affected directly by a participating hospital's violation*" to sue in state or federal court. *Id*. (citing H.R.Rep. No. 99-241, pt. 1, at 132) (emphasis added). However, the provision later was amended to apply to "*[a]ny individual who suffers personal harm* and any medical facility which suffers financial loss as a direct result of a participating hospital's violation . . . ." *Id*. (citing H.R.Rep. No. 99-241, pt.3, at 3) (emphasis added). The report of the House Judiciary Committee explains that the bill was intended to authorize "only two types of actions for damages." *Id*. (citing H.R.Rep. No. 99-241, pt.3, at 3, *reprinted in* 1986 U.S.C.C.A.N. 42, 728). The first type of action "could be brought by the individual patient who suffers harm as a direct result of [the] hospital's failure to appropriately screen, stabilize, or properly transfer the patient," and the second type of action could be maintained by the adversely affected medical facility. *Id*. The final version of the bill contained virtually identical language, except that the reference to suits by a "medical facility" was deleted because another provision of the statute already provides for such suits. *Id*. at 1326-7.

The court determined that the legislative history "suggests quite strongly that Congress intended to allow suit only by what the House Judiciary Committee called the 'individual patient,' that is, the individual for whose medical condition the emergency medical examination

---

[3]Notably, the plaintiff in *Zeigler* brought suit in both her individual and a representative capacity. Pauly brings suit only on her own behalf. (*See* Pl.'s Opp., 2:5-6.)

or treatment was sought." *Zeigler*, 56 F. Supp. 2d at 1327.  It also found that this reading of the provision was supported by traditional principles of statutory construction.  It noted that under §1395dd(a), "if *any individual* . . . comes to the emergency department and a request is made *on the individual's behalf* for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination . . . ."  In light of this use of "individual," the court concluded that the term "clearly refers to the individual with the medical condition, and [that] it makes sense that Congress would carry this meaning forward to §1395dd(d)(2)(A)." *Zeigler*, 56 F. Supp. 2d at 1327.  The court observed that the use of "individual" to refer to the "individual patient" is consistent throughout §1395dd.  *Id*. (citing 42 U.S.C. §§1395dd(a)-(i)).

In *Sastre,* the plaintiffs were the patient, her husband, and their daughter.  As in *Zeigler*, the defendant hospital argued that neither the husband nor the daughter had third-party standing; the court agreed on the basis of EMTALA's legislative history.  *Sastre*, 93 F. Supp. 2d at 111.  However, the court also distinguished cases in which an "EMTALA claim passes on to a deceased patient's heirs" from cases involving relatives of a living patient with an EMTALA claim.  *Id.*[4]

In *Moses v. Providence Hosp. and Medical Ctr. Inc.*, 561 F.3d 573, 580 (6th Cir. 2009), the plaintiff was the representative for the estate of a deceased woman.  The representative alleged that the defendants violated EMTALA by prematurely releasing the deceased's husband, who later murdered her.  The Sixth Circuit distinguished *Zeigler and Sastre*, reasoning that "because the estate of the individual who suffered an actual personal injury brings the suit in this case, claiming personal harm as a direct result of the hospital's decision, those decisions are inapposite and of limited persuasive value." *Id*. at 580.  However, the court also commented that the "plain language of the civil enforcement provision of EMTALA contains very broad language

---

[4]The court distinguished *Correa v. Hospital San Francisco*, 69 F.3d 1184 (1st Cir. 1995) on the basis that *Correa* "does not squarely address whether the relatives of a living patient have a cause of action under EMTALA." *Sastre*, 93 F. Supp. 2d at 111.  It concluded that "the scope of the First Circuit's holding is circumscribed to a situation where the heirs of a dead patient inherit his or her EMTALA cause of action." *Id.*

regarding who may bring a claim." *Id*. The court minimized the legislative history relied upon by the courts in *Zeigler and Sastre*, noting that "where a House committee's explanation of the meaning of a statute seems to differ from the statute's actual wording, this Court should not rely on that committee's statement as the exclusive explanation for the meaning of the statute." *Id*. (citing *Exxon Mobil Corp. v. Allapatah Servs., Inc.*, 545 U.S. 546, 568 (2005)). It concluded that "EMTALA's plain language belies Defendants' argument that Congress intended to deny non-patients the right to sue in every circumstance[,]" while at the same time "recogniz[ing] that [its] interpretation of the civil enforcement provision may have consequences for hospitals that Congress may or may not have considered or intended." *Id*. at 581-82.

The Sixth Circuit also addressed directly the argument that the words "any individual" contained in §1395dd(d)(2)(A) must be read in context with the rest of the statute. It observed that "the medical screening requirement and the stabilization requirement do not refer to the same 'individual' – the medical screening requirement of §1395dd(a) only applies to individuals who come to an 'emergency department,' presumably a smaller subset of individuals than those 'who come to a hospital' and are the subject of §1395dd(b), and that "[t]his differing language indicates that Congress did not intend EMTALA's entire statutory scheme to apply to the same 'individual' in every part of the statute." *Id*. at 580. The court concluded that "the fact that the statute expressly limits the individual to whom the hospital owes its EMTALA obligations in §§ 1395dd(a) and (b) indicates that the breadth of the civil enforcement provision was no accident." *Id*. It also concluded that "[i]f Congress had intended to limit the right of action to any individual who 'comes to a hospital' as a patient, it could have done so, just as it did in other parts of the section." *Id*. at 580-81 (citing *United States v. Parrett*, 530 F.3d 422 (6th Cir. 2008)).

Having considered all of the relevant case law carefully, this Court finds *Zeigler* and *Sastre* more persuasive than *Moses*. In light of the unique facts of that case, the statutory analysis in *Moses* was unnecessary to the holding. Because Congress did limit expressly the persons to whom a hospital owes its EMTALA obligations, it was unnecessary for it to limit expressly the private right of action for enforcing these obligations. *Moses* itself recognizes that §§ 1395dd(a)

7

and (b) apply to distinct groups of "individual patients," and thus Congress's decision to extend a private right of action to "any individual" properly may be understood as evidence of an intent to extend that right to each group of "individual patients" described in the statute.

**D.      Conclusion**

Extending a private right of action to a third party when the individual patient is still living would result in a significant expansion of liability for hospitals subject to EMTALA's provisions. Because the language of the statute as a whole is inconsistent with such a result, this Court adopts the narrower reading upheld in *Zeigler* and *Sastre*. Nothing in this analysis precludes Pauly from bringing a representative action on behalf of her daughter or from asserting, based upon her allegations that she witnessed Makenzie's suffering directly, a state-law claim for negligent infliction of emotional distress.

### IV.  ORDER

Good cause therefor appearing, the motion to dismiss is GRANTED, with leave to amend. Any amended pleading must be filed within thirty (30) days of the date of this order.

DATED:  May 11, 2011

_____
JEREMY FOGEL
United States District Judge